**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| AUSTIN BEAU CUMMINGS, | |
| Plaintiff, | No. C18-4021-LTS |
| vs. | |
| JORMA SCHWEDLER, KYLE WIIG, JENNIFER WERSAL, MARINUS JORGENSON, JUSTIN DONAGHU | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

## I.    INTRODUCTION

This case is before me on a motion (Doc. 98) for summary judgment by defendants Justin Donaghu, Marinus Jorgenson, Jorma Schwedler, Jennifer Wersal and Kyle Wiig.[1] Plaintiff Austin Beau Cummings has filed a resistance (Doc. 102) through counsel and a separate pro se resistance (Doc. 110).[2]  Defendants have filed a reply (Doc. 103).  Oral argument is not necessary.  See Local Rule 7(c).

---

[1] Defendants' full names were identified for the first time in their answer (Doc. 86).

[2] On February 24, 2021, Cummings filed a pro se motion (Doc. 104) for new counsel.  United States Magistrate Judge Mark A. Roberts held a hearing on the motion and denied it without prejudice to refiling after the motion for summary judgment is ruled upon.  He also allowed Cummings to submit any pro se supplemental resistance to the motion for summary judgment by March 19, 2021.  Cummings did not file a pro se resistance by that date but later moved, through counsel, for an extension of time to file the pro se resistance.  That motion was granted and Cummings then filed his pro se resistance on March 24, 2021.  Docs. 108, 109, 110. Defendants filed a reply (Doc. 113) on March 26, 2021.  I have considered the pro se resistance and reply in the course of analyzing the issues raised by the defendants' motion (Doc. 98) for summary judgment.

## II. PROCEDURAL BACKGROUND

I summarized the procedural history of this case in a previous order (Doc. 83) on motions for summary judgment that were filed on behalf of two sets of defendants. Those defendants (with the exception of Schwedler) have been dismissed from this case. *See* Doc. 83. The only remaining claims following that order are Cummings' claims for excessive force against Schwedler and the above-named remaining defendants. *Id.*[3] Those claims, pursuant to 42 U.S.C. § 1983, are the subject of the instant motion.

Cummings alleges the defendants engaged in the following acts constituting excessive force:

- Schwedler shot Cummings with a pepper ball gun and ordered/led a raid on Cummings' holding cell

- Wiig forced Cummings to his bunk using a shield during a cell extraction and in a separate event, slammed Cummings' head against the wall while Cummings was handcuffed

- Jorgensen made Cummings run with leg chains on, hip tossed him and slammed him to the ground

- Donaghu made Cummings run with leg chains on[4]

- Wersal sent a team in to harm Cummings

Doc. 98-1 at 2; Doc. 102-1 at 2.


## III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the

---

[3] I denied Cummings' subsequent motion to reconsider. *See* Doc. 89.

[4] Cummings' pro se resistance also states that Donaghu kneed him while in the restraint chair. *See* Doc. 110 at 2, ¶ 6 [sic] (d).

2

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it

3

relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV.    RELEVANT FACTS

The following facts are undisputed except where noted otherwise:

### A.    Background

Cummings was booked into the Woodbury County Jail (Jail) on or about December 11, 2015, on charges that included Assault While Participating in a Felony, Second Degree Theft, Going Armed with Intent, First Degree Robbery and Violation of Probation. On May 10, 2018, he pled guilty to Second Degree Robbery and Second Degree Theft. He was sentenced to an indeterminate term of incarceration not to exceed 10 years on the robbery charge and 5 years on the theft charge. Cummings left the Jail on May 10, 2018. During his incarceration, Cummings was locked down for behavioral reasons, typically associated with violation of jail rules and arguing with jail staff. He was disciplined for threatening jail staff, refusing to obey orders and fighting with other inmates and staff.

4

*B.*     *Claims Against Schwedler*

On September 10, 2017, Cummings was moved to a temporary cell after being involved in a fight with another inmate. He was given a mattress, a blanket and toilet paper. Late that evening, Cummings started yelling at Sergeant Stahlecker, who was passing out medication in the hallway. Cummings demanded his sandals, said he was tired of being "messed with," and that he was going to start "acting up." Stahlecker talked to Cummings and tried to calm him down. He told Cummings he would discuss the matter with Schwedler and they would determine whether to return Cummings' personal belongings. Cummings appeared to calm down. A few minutes later, officers noticed that Cummings had covered the camera in his cell with toilet paper. Stahlecker and others approached Cummings' cell and observed he was upset. He threatened to "start going off" on the officers and said he was going to flood his cell and was tired of his life and how he was being treated. Stahlecker and Schwedler decided to move Cummings to a different temporary cell that did not have water. Because Cummings had been involved in multiple fights with both officers and inmates in the past, the Resistant Inmate Secure and Control (RISC) team was called to assist with the move.

Schwedler and the RISC Team arrived at Cummings' cell and, through the open food pass, Schwedler advised Cummings to lie down on his bunk so that he could be handcuffed. Cummings refused and became argumentative. Schwedler repeated the order twice and Cummings refused to comply each time.

Schwedler pointed a pepper ball gun loaded with inert rounds containing a substance similar to baby powder through the food pass. When he pulled the trigger, the weapon malfunctioned. According to defendants, Schwedler attempted to fire a second time without success. Cummings states that Schwedler attempted to shoot him "several" times with the pepper ball gun, not just twice, and states three distinct shots can be heard on the video. Doc. 102-1 at 2. He also notes the video shows Schwedler pulling the trigger rapidly and pointing the gun indiscriminately into the cell.

5

Schwedler handed the pepper ball gun to another officer and other officers repeated the command for Cummings to lie down on his bunk. Cummings continued to argue. Officers then entered his cell and Wiig forced Cummings onto his bunk using a shield. Cummings continued to resist by holding onto the shield and refusing to allow the officers to apply handcuffs and shackles. Eventually, Officer Stroman deployed his Taser, striking Cummings twice in the upper torso. The officers restrained Cummings and moved him to a secure cell.

## C.    *Claims Against Wiig*

Wiig was part of the RISC team during the incident described above. After Cummings refused to obey Schwedler's orders, Wiig ordered Cummings to lie down on his bunk. Cummings refused and responded with various profanities. Wiig entered the cell and Cummings approached him in an aggressive manner. Wiig used the shield he was carrying to put Cummings on his bunk. He ordered Cummings to roll onto his stomach and place his hands behind his back. Cummings refused and tried to grab the shield Wiig was holding before he was tased.[5] Cummings states Wiig told him only to "get" on the bunk and that Cummings was sitting on his bunk when officers entered.

During a separate event, Wiig and other officers moved Cummings from a temporary holding cell to a different section of the Jail following a fight between Cummings and another inmate. As officers escorted Cummings to the top of some stairs, they advised him to stop pushing back. Cummings then tried to kick the officers. He was placed against a wall while the officers waited for the cell to be unlocked. Cummings then began trying to headbutt the officers. Wiig put Cummings' head back against the wall as they continued to wait.[6] Cummings states Wiig "slammed" his head against the

---

[5] Cummings admits these facts, *see* Doc. 102-1 at ¶ 18, but includes additional facts.

[6] Cummings' admits these facts, *see* Doc. 102-1 at ¶ 16, but qualifies some of the statements of fact.

wall and notes that in the video of this incident, he can be heard complaining twice about Wiig having slammed his head against the wall. Doc. 102-1 at 3. Cummings also states that Wiig slammed Cummings' head against the wall because Cummings cursed at him. Cummings states he was "dazed" from this incident, became "nearly unconscious" and had a mark on his head the next day. *Id.* at 4. He notes that defendants refused to take pictures of the mark and did not produce the overhead footage of the incident. *Id.*

### D. *Claim Against Wersal*

On May 28, 2017, Wersal was on her way toward the "B" Block for a jail check. As she walked past "A" Block, Cummings was standing at the door looking through the window. She stopped and opened the food pass to ask what he needed. Cummings was upset because an officer had allegedly shined a light in his eyes. She reminded him not to look through his window when officers were doing their jail check. Cummings became upset, called Wersal a "bitch" and swore at her. Wersal ordered Cummings to "lock down" several times and he refused. She then advised Secondary Control to advise "A" Block to lock down. Everyone but Cummings went to their cell. Cummings refused, grabbed a pencil and sat down at a table in the day room. Cummings adds that he asked to talk to a Sergeant and believed Sergeant Alias was present at the Jail. Wersal declined his request and refused to identify the officer who had allegedly pointed the flashlight in Cummings' eyes. Cummings states that because the first step in the Jail's Grievance Procedure is to talk to the Shift Sergeant on duty, Wersal denied Cummings the right and ability to follow the first step in the Grievance Procedure. Cummings then tried to write out a grievance.

Jorgensen heard the commotion and witnessed what was happening. He retrieved the pepper ball gun and went with several other officers outside of "A" Block. They entered "A" Block and ordered Cummings to get on the ground. Cummings refused and remained at the table staring at the officers and holding a pencil. Officer Lamoureux

shot Cummings with the pepper ball gun twice in the right arm but the shots had no apparent effect. The officers then approached Cummings, took him to the floor, put him in handcuffs and leg chains and escorted him to a temporary holding cell.

Wersal was not part of the team that entered "A" Block. Cummings agrees, but notes she gave the order for officers to go get him. She remained in the hallway and observed through the window. While she said "tase him" at one point, there is no evidence that any of the officers heard what she said and Cummings was not tased.

### E.    Claims Against Jorgensen and Donaghu

Jorgensen and Donaghu were involved in the incident described above. They restrained Cummings by putting him in handcuffs and leg chains to escort him to a temporary holding cell. On the way to the cell, Cummings said he was not going to walk and that they could carry him. After saying that, his feet dropped out from under him[7] shifting his weight to the officers. Jorgensen responded by taking Cummings to the floor[8] where he, Donaghu and others restrained Cummings until he could be placed in a restraint chair and wheeled to his cell. The parties dispute whether anyone was running, hip tossed or slammed to the ground during the move. Cummings states Jorgensen and Donaghu put leg chains on him and made him run with the leg chains on. He also states Jorgensen "judo tossed" him, "flipped" him and "slammed" him to the ground. *Id.* at 5. Cummings admits Donaghu did not "hip toss" him but states Donaghu was part of causing him to run with leg chains on. *Id.* He states that the actions of Jorgensen and Donaghu "messed [his] knee up." *Id.* He also points out that the videos did not fully capture this incident.

---

[7] Cummings states this was due to tripping, which was caused by Jorgensen and Donaghu making him run with leg chains. Doc. 102- at ¶ 20.

[8] Cummings contends Jorgensen did this by "hip tossing him" and "slamming" him to the ground. Doc. 102-1 at ¶ 21.

8

*F.    Prison Litigation Reform Act (PLRA) Exhaustion Requirement*

Upon being booked into the Jail, Cummings had the opportunity to review the Woodbury County Jail Inmate Rule Book that is placed in each residential section of the facility for easy access.  Beginning in November 2017, the Rule Book was placed in a Kiosk for inmate access in the residential areas.  It was also published on the CELLCAST system.[9]  The Rule Book sets forth a Grievance Procedure that applies to all conditions of confinement for those detained in the Jail.

The parties dispute the requirements of the Grievance Procedure.  According to defendants, inmates are directed to submit formal written grievances that clearly define the situation and facts in question, specify the alleged wrongful act or situation the incident arose out of, address matters within the control of the facility and request a remedy within the power of the facility.  They must also include a copy of any written supporting documents.  Doc. 98-1 at 8.  Cummings states the rules provide that an inmate "may" submit grievances and that there is nothing in the Grievance Procedure that requires an inmate to submit a grievance before filing a lawsuit.  Doc. 102-1 at 7.

Defendants state that if an inmate feels that the facility's actions are inappropriate or lacking, including incidents where force was used, they are then directed to communicate their concerns to the Shift Sergeant on duty.  Doc. 98-1 at 9.  Cummings disagrees, stating the Grievance Procedure provides that "[a]n inmate <u>may</u> file an informal grievance by discussing the specific problem with a staff member."  Doc. 102-1 at 8 (emphasis added by Cummings).  According to defendants, if an inmate is still dissatisfied with the resolution of their complaint, they are directed to resubmit their written grievance to the Lieutenant or the Major in charge.  Doc. 98-1 at 9.  Cummings disputes this, noting that the Grievance Procedure provides: "If you still feel that

---

[9] The CELLCAST system is played on television monitors that provide information for all Jail inmates so they have continuous access to the information displayed.  The television monitors are placed in various locations in the Jail.

inappropriate or no action has been taken, you <u>may</u> resubmit your written grievance to the Lieutenant in Charge or Major." Doc. 102-1 at 8 (emphasis added by Cummings).

The Jail maintains inmate files within the regular course of its operations.[10] Information like inmate grievances and responses are kept in those files. The Jail maintained a file on Cummings. Defendants state Cummings did not submit a written grievance to the Lieutenant in Charge (Todd Harlow) or Major (Greg Stallman or Tony Wingert) pertaining to his allegations of force against defendants.

In December 2016, Cummings submitted a grievance to Schwedler in which he complained about medical care, access to law books, the opportunity to attend church, the use of recreational equipment, the telephone system available to inmates, use of the basketball court on top of the building and an incident involving force in which he wrote: "I have been head slammed against the wall handcuffed also in separate occasion my head slammed against the wall almost knocking me unconscious while handcuffed[.]" Doc. 98-1 at 9-10. Relevant to the allegations in the instant case, defendants note Cummings' grievance did not provide any detail, including the identity of the officer(s) involved and did not request a remedy as required by the grievance procedure. While Cummings brought the matter to the attention of a Sergeant, he did not submit the grievance to Harlow, Stallman or Wingert after receiving a response from the Sergeant. Cummings states the Grievance Procedure does not require the submission of a grievance and, in any event, he filed a grievance as described above. He states the response to the grievance was: "If you feel that you have had excessive force used on you, you will need to contact your attorney." Doc. 102-1 at 9. Cummings states he submitted grievances related to all claims in this case and was not asked about the submission of grievances in his deposition. *Id.*

---

[10] Cummings notes that to the extent the Jail purports it keeps files pursuant to a records policy it has not provided a copy of said policy to Cummings. Doc. 102-1 at 8.

# V.    ANALYSIS

## A.    Did Cummings Exhaust His Administrative Remedies?

Defendants argue they are entitled to judgment as a matter of law because Cummings failed to submit grievances related to the alleged actions of defendants in this case as required by the Jail's Grievance Procedure. Cummings, referencing his answers to interrogatories, argues he did submit grievances. Second, he argues the Jail's Grievance Procedure is permissive, not mandatory.

Under the PLRA, a prisoner may not pursue a § 1983 claim in federal court before exhausting all available administrative remedies. *See* 42 U.S.C. § 1997e(a). Exhaustion is a prerequisite to suit even when the prisoner seeks relief that is unavailable through the grievance system such as for excessive force. *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citing *Booth v. Churner*, 532 U.S. 731, 741 (2001)). Proper exhaustion under the PLRA requires not only the pursuance of all available remedies, but also compliance with individual prisons' grievance procedures to whatever level of detail they may require. *Jones v. Bock*, 549 U.S. 199, 218 (2007).

The Jail's Grievance Procedure, as explained in the August 2017 Rule Book, provides:

```
An inmate may file an informal grievance by discussing the
specific problem with a staff member. Normally these informal
grievances are filed verbally with an officer having contact
with the inmate during routine supervision. Where and when
possible, the officer receiving the grievance may address the
complaint of condition directly.

Emergency grievances, in which delay in handling could result in
personal injury or other damages to the inmate, will be handled
expeditiously. Officers are encouraged to use their own
initiative to resolve issues that are within their authority.
If not resolved at the officer level, the grievance will be
passed on to the Shift Supervisor for action or subsequent
referral.
```

11

1.  If you feel that appropriate actions have not been taken
    with respect to your grievance, you should inquire of the
    Shift Sergeant on the shift that you originally submitted
    the grievance, as to what, if any action, has been taken to
    satisfy your grievance.

If you still feel that inappropriate or no action has been
taken, you may resubmit  your written grievance to the
Lieutenant in Charge or Major.  You will be given a response to
your grievance verbally or in writing within seven (7) working
days excluding weekends and holidays.

Formal grievances are filed in writing, and an inmate may ask
for assistance from officers or other inmates in writing of the
grievance.  A problem that results from a specific event or
action must be presented within seven (7) days of the
occurrence.  The grievance must:

-Be in writing;
-Clearly define the situation in question, and the facts upon
 which it is based;
-Specify the wrongful act or situation, and describe the harm
 done;
-Arise out of an act of failure to act by the Woodbury County
 Jail;
-Address a matter within the control of the facility;
-Request a remedy that is within the power of the facility to
 grant;
-Be submitted within seven (7) days of the occurrence;
-Include a copy of any written supporting documents or pertinent
 discussion, decision and justification; and
-Specify a requested remedy.

**Your signature and your assigned cell number must accompany ALL
complaints or grievances.**

Doc. 98-3 at 89-90.[11]

Cummings did not submit a written grievance to Stallman, Wingert or Harlow as the last step of the Grievance Procedure pertaining to any of his allegations against defendants.  He submitted a written grievance in December 2016, stating in relevant part: "I have been head slammed against the wall handcuffed also in separate occasion my

---

[11] The Grievance Procedure in the 2015 Rule Book is identical.

12

head slammed against the wall almost knocking me unconscious while handcuffed." *See* Doc. 98-3 at 74. Cummings brought this matter to the attention of a Sergeant and received a written response. *See* Doc. 98-3 at 93 (stating in relevant part, "If you feel that you have had excessive force used on you, you will need to contact your attorney."). He did not resubmit the grievance to Stallman, Wingert or Harlow.

Cummings' argument that the Grievance Procedure is permissive, not mandatory, misconstrues the purpose of the Grievance Procedure in light of the PLRA. Cummings interprets "may" as meaning the Grievance Procedure is optional in resolving grievances. Of course, the Grievance Procedure is optional in the sense that nothing obligates an inmate to file a grievance upon experiencing a violation of his rights. However, if an inmate desires that some action be taken as a result of a rights violation, then he must exhaust the administrative remedies that are "available." *See* 42 U.S.C. § 1997e (providing that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Cummings makes no argument that the Grievance Procedure was unavailable to him. Under the PLRA, he was required to exhaust his remedies pursuant to that procedure prior to filing suit.

The only written grievance in the record is dated December 21, 2016, which could be related to the September 7, 2016, head slamming incident Cummings alleges against Wiig. *See* Doc. 98-3 at 74-77, 141-42, 172. Citing his answers to interrogatories, Cummings argues he did submit grievances against each of the defendants regarding his claims of excessive force against them. *See* Doc. 98-3 at 32-37. As noted above, there is no other evidence of these grievances, including in Cummings' inmate file. The issue, therefore, is whether Cummings' answers to interrogatories are sufficient to demonstrate a genuine issue of material fact as to whether he exhausted his administrative remedies.

13

Under *McPeek v. Blanchard*, 670 F. App'x 424, 424-25 (8th Cir. 2016), I conclude that they are.

In *McPeek*, the record consisted of evidence that the jail (which happens to be the same jail) maintained files of inmates' grievances and other correspondence and had no record of plaintiff filing a written grievance about the assault alleged in his complaint. *McPeek*, 670 F. App'x at 424. The record also consisted of plaintiff's affidavit (corroborated by later testimony at a hearing) stating that he had submitted a written formal grievance the day after he was assaulted, received no response, and had no knowledge of what happened to the written grievance. *Id.* There was also an unsigned inmate screening form indicating that McPeek had no injuries on the day after the alleged assault and a written document titled "Appeal" which McPeek submitted to jail staff several weeks after the date of the alleged assault that complained of the alleged assault but did not mention a prior grievance. *Id.*

On this record, the district court concluded it was beyond genuine dispute that plaintiff had failed to exhaust administrative remedies and dismissed the complaint. The Eighth Circuit reversed, finding that plaintiff's affidavit and supporting testimony established a genuine dispute as to whether plaintiff submitted a timely written grievance. *Id.* at 424-25. While Cummings has presented less evidence in this case, his answers to interrogatories stating that he did file grievances are substantively similar to the affidavit and testimony in *McPeek*. Based on *McPeek*, I find a genuine issue of material fact as to whether Cummings exhausted his administrative remedies. Therefore, I will go on to consider whether defendants are entitled to summary judgment based on the merits of Cummings' claims.

14

**B.  Did Defendants Violate Cummings' Constitutional Rights?**

**1.  Applicable Law**

**a.  Section 1983 claims**

Cummings brings his claims pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). Section 1983, however, provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393-94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "[O]ne cannot go into court and claim a violation of [42 U.S.C.] 1983' –for [42 U.S.C.] 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, Section 1983 serves as a vehicle for plaintiffs to vindicate rights that exist under other bodies of law such as the Constitution and statutes. 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271.

**b.  Excessive force**

An excessive force claim by a pretrial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014). "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n. 10, (1989). The Fourteenth Amendment gives state pretrial detainees "rights which are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Walton*

15

*v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014). Indeed, pretrial detainees have greater protection because "the Due Process Clause prohibits any punishment of a pretrial detainee, be that punishment cruel-and-unusual or not." *Smith v. Conway Cty., Ark.*, 759 F.3d 853, 858 (8th Cir. 2014).

Excessive force claims of pretrial detainees are reviewed under an objective reasonableness standard. See *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "[O]bjective reasonableness turns on the 'fact and circumstances of each particular case.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish,* 441 U.S. 520, 540 (1979)). Relevant factors in assessing the objective reasonableness of force used include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

### c. *Qualified Immunity*

Qualified immunity shields a government official from individual liability when the official's conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004). "The Supreme Court has generously construed qualified immunity protection to shield 'all but

16

the plainly incompetent or those who knowingly violate the law.'" *Davis*, 375 F.3d at 711-12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). To determine whether a defendant is entitled to qualified immunity, courts ask (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right, and (2) whether that constitutional right was clearly established as of the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity.

All of the defendants have raised a qualified immunity defense. Thus, I will consider whether Cummings can demonstrate a genuine issue of material fact as to whether there was a constitutional violation as to each of his claims. *Krout v. Goemmer*, 583 F.3d 557, 563-64 (8th Cir. 2009) (explaining the initial inquiry as "whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional ... right"). *Parrish v. Dingman*, No. C16-3095-LTS, 2017 WL 5560280, at *4 (N.D. Iowa Nov. 17, 2017), *aff'd,* 912 F.3d 464 (8th Cir. 2019). If the answer is "no" as to a particular defendant, then that defendant will be entitled to qualified immunity and summary judgment.

### 2.    *Claims Against Schwedler*

Cummings claims against Schwedler are based on Schwedler's attempting to fire a pepper ball gun at Cummings and leading or ordering the "raid" on him. Neither establishes a violation of constitutional rights.

Schwedler decided to move Cummings to another temporary cell that did not have water after Cummings threatened to start "acting up," covered the camera to his cell with toilet paper and threatened to flood his cell. The RISC team assisted with the move

because Cummings had been involved in multiple fights with both officers and inmates in the past. Indeed, the reason Cummings was in a temporary cell was because he had recently been involved in a fight with another inmate.

Cummings argues that he did not pose an immediate safety threat because there is no evidence that he actually attempted to flood his cell. Officers were not required to wait until Cummings caused a disturbance before removing him from a situation that would allow him to cause such a disturbance. *See Kingsley*, 576 U.S. at 399-400 ("a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate"); *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013) (noting the "core judicial inquiry is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"). I find no evidence that Schwedler's decision to use the RISC team to transfer Cummings to another cell was made to "maliciously and sadistically . . . cause harm." *Santiago*, 707 F.3d at 990.

With regard to use of the pepper ball gun, it is undisputed that Schwedler attempted to fire the gun, but it malfunctioned and no projectile ever hit Cummings. The pepper ball gun was loaded with inert rounds. Doc. 102-1 at ¶ 12. Even if the pepper ball gun had fired, it would not have constituted excessive force under the circumstances. The Eighth Circuit has recognized that the use of mace or similar chemical agents in small quantities is constitutionally permissible to subdue a "recalcitrant prisoner" even if the prisoner is locked in his cell or in handcuffs. *See Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000). *See Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) ("the few cases where we denied summary judgment in Eighth Amendment excessive force claims based on pepper spraying have involved no warning this force would be used, no apparent purpose other than inflicting pain, use of unnecessary "super-soaker" quantities of

18

chemical, refusal to allow the victim to wash off the painful chemical for days, and/or use of additional physical force.").

Schwedler commanded Cummings to lie down on his bunk multiple times and he refused. While Schwedler pointed the pepper ball gun at Cummings through the food pass and pulled the trigger multiple times, it did not fire. Because Eighth Circuit precedent demonstrates that use of the pepper ball gun under these circumstances would not have amounted to excessive force, Cummings' claim – based on a failed attempt to use the pepper ball gun – falls far short of demonstrating excessive force. Because the facts when viewed in the light most favorable to Cummings do not establish a violation of a constitutional right, I need not evaluate the "clearly established" prong of the qualified immunity analysis. *See Habhab v. Hon*, 536 F.3d 963, 969 (8th Cir. 2008) ("If the allegations and undisputed facts do not amount to a constitutional violation, 'there is no necessity for further inquiries concerning qualified immunity.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))). Schwedler is entitled to qualified immunity.

### 3. *Claims Against Wiig*

Cummings' claims against Wiig are based on use of the shield in the incident described above and allegedly slamming Cummings' head against a wall during a separate cell transfer in September 2016. After Cummings refused to comply with Schwedler's orders to lie down on his bunk and use of the pepper gun failed, Wiig and others entered the cell. Cummings refused Wiig's commands to lie down on his bunk, at which point Wiig used his shield to put Cummings on the bunk and ordered him to roll onto his stomach and place his hands behind his back. Cummings resisted and tried to grab the shield. When Cummings refused to allow the officers to apply handcuffs and shackles and continued to struggle, another officer deployed his taser, striking Cummings twice in the upper torso. Cummings argues there are disputes of fact as to what happened. He

contends he was sitting on his bunk and there is no evidence he failed to comply with a demand to get on his bunk before officers entered his cell.

The Eighth Circuit has held that the use of prone restraint is not objectively unreasonable when a detainee actively resists officer directives and efforts to subdue the detainee. *Lombardo v. City of St. Louis*, 956 F.3d 1009, 1013 (8th Cir. 2020) (citing *Ryan*, 850 F.3d at 427-28). As the court explained:

> In *Ryan*, law enforcement officers attempted to extract a detainee from his cell, which the detainee resisted. Officers held the detainee down in the prone position and one officer twice deployed a taser in drive stun mode to allow the other officers to place the detainee's wrists and ankles in restraints. In holding that this use of force was not excessive, [the Eighth Circuit] explained that "[a]mong the most important [factors] is the observation that [the detainee] was actively resisting the extraction procedure by ignoring directives to lie down on his bunk and resisting the [officers'] efforts to subdue him once they entered his cell."

*Id.* (citing *Ryan*, 850 F.3d at 424-28).

Here, Cummings was ordered multiple times to lie on his bunk before officers entered the cell. He did not comply.[12] As officers entered the cell, they continued to order Cummings to lie down on the bunk. Cummings responded by trying to grab the shield and resisting officers' attempts to restrain his wrists and ankles. Wiig's use of the shield to place Cummings on his bunk and limit his movement while officers could secure wrist and ankle restraints is similar to the force used by officers in *Ryan*. Such force was

---

[12] To the extent Cummings argues officers told him only to "get" on the bunk, this is blatantly contradicted by the record, particularly the video evidence in which officers can be heard repeatedly stating "lay down," "lay down on the bunk" and "lay on the bunk, Austin." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Cummings also admits he refused to comply and resisted by holding onto the shield when officers entered the cell. *See* Doc. 102-1 at 2-3.

20

not deemed excessive under those circumstances and was not excessive here. Wiig is entitled to qualified immunity on this claim.

With regard to Cummings' second claim, on or about September 7, 2016, Wiig and others were involved in transferring Cummings to the B Block after he was involved in a fight with another inmate in E Block. Cummings admits that as officers escorted Cummings to the top of some stairs, they advised him to stop pushing back. Cummings then tried to kick the officers. He was placed against a wall while the officers waited for the cell to be unlocked. Cummings then began trying to headbutt the officers. Wiig put Cummings' head back against the wall as they continued to wait. Cummings qualifies these facts stating that Wiig "slammed" his head against the wall and notes that in the video of this incident, he can be heard complaining twice about Wiig having slammed his head against the wall. Doc. 102-1 at 3. Cummings also states that Wiig slammed Cummings' head against the wall because Cummings cursed at him. Cummings states he was "dazed" from this incident, becoming "nearly unconscious" and had a mark on his head the next day. *Id.* at 4. He notes that defendants refused to take pictures of the mark and have not produced the overhead footage of the incident. *Id.*

Cummings argues there was no justifiable reason for slamming his head against the wall and that, when viewing the facts in the light most favorable to Cummings, a jury could conclude Wiig did so because Cummings cursed at him. The parties agree that at the top of the stairs Cummings was placed against the wall because he was resisting by either pushing back or leaning back. While Cummings claims his head was slammed against the wall because he was cursing at the officers, he also admits that he began trying to headbutt the officers. *See* Doc. 102-1 at ¶ 16. The subjective intent of the officer is immaterial because I must view the facts from the perspective of a reasonable officer on the scene. *See Kingsley*, 576 U.S. at 399-400 (rejecting analysis of a defendant's subjective state of mind in excessive force cases stating "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one"); *Grider v. Bowling*,

785 F.3d 1248, 1252 (8th Cir. 2015) ("The dispositive question is whether the officer's conduct was objectively reasonable under the circumstances, as judged from the perspective of a reasonable officer on the scene at the time the force was applied.").

From the reasonable officer's perspective, Cummings was agitated and cursing at officers as he was being transferred to a different cell due to a fight he had been involved in with another inmate. Cummings started actively resisting at the top of the stairs at which point his body was placed against the wall. Cummings then started using his head to try to headbutt the officers. It was not unreasonable for the officer to restrain this movement by putting Cummings' head against the wall. While Cummings suggests the force was disproportionate – claiming that his head was "slammed" against the wall – it was not unreasonable for Wiig had to apply enough force to counteract the force Cummings was using to try to headbutt the officers. *See Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011) (concluding use of force and amount of force used in an arm-bar maneuver was objectively reasonable where officer reasonably believed inmate constituted a threat to his safety); *Smith v. Conway Cnty.*, 759 F.3d 853, 858-59 (8th Cir. 2014) (analyzing the amount of force appropriate in a prison setting to determine whether it "was applied in a good-faith effort to maintain or restore discipline.").

I find that Cummings has failed to demonstrate a genuine issue of material fact as to whether Wiig's use of force was objectively unreasonable under the circumstances. Wiig is entitled to qualified immunity on this claim as well.

### 4. *Claims Against Jorgensen and Donaghu*

Cummings claims that on May 28, 2017, Jorgensen and Donaghu (1) made him run with leg chains on and (2) that Jorgensen "hip tossed" him and slammed him to the ground.[13] This incident took place after Cummings refused to lockdown and officers

---

[13] Cummings states in his pro se resistance that his claim against Donaghu is also based on Donaghu kneeing him while he was in the restraint chair. *See* Doc. 110 at 2, ¶ 6 [sic] (d).

22

were transferring him to a temporary holding cell. On the way to the cell, Cummings told officers he was not going to walk and let his feet drop out from under him, shifting his weight to the officers. Jorgensen then took Cummings to the floor, where he, Donaghu and other officers restrained Cummings until he could be placed in a restraint chair.

With regard to Cummings' claim that the officers used excessive force in making him run with leg chains on, there is no evidence in the record from which a reasonable jury could conclude that use of the leg chains in this situation, and the speed at which officers moved down the hall, was objectively unreasonable. Viewing the circumstances from the perspective of a reasonable officer on the scene and in the light most favorable to Cummings, Cummings had a history of being involved in multiple fights with other inmates, threatening officers and refusing to comply with commands. On this occasion, he had refused to lockdown multiple times and continued to ignore commands when multiple officers entered the room and told him to get on the ground. The pepper ball gun was used against Cummings and he continued to ignore commands. Eventually, he was physically taken to the ground by officers, at which point his wrists and ankles were restrained.

The video demonstrates Cummings continually yelled obscenities at the officers during this incident and was clearly agitated. Cummings was then escorted out of the room and down the hallway by Jorgensen and Donaghu at his sides and several officers following behind, demonstrating the threat reasonably perceived by the officers. While the officers may have been walking quickly, there is no evidence to support that use of the leg chains or the speed at which the parties were moving was objectively unreasonable given the situation. After walking a short distance, it is undisputed that Cummings stated he was not going to walk and the officers could carry him. At this point, his weight dropped. There is no evidence that Cummings gave the officers any indication that he was having difficulty moving in the leg chains before stating he was not going to walk

and that the officers could carry him, which could reasonably be interpreted by the officers as resistance. Cummings has failed to demonstrate a genuine issue of material fact concerning whether use of the leg chains in this situation amounted to a constitutional violation. Jorgensen and Donaghu are entitled to qualified immunity on this claim.[14]

Cummings' claim that Jorgensen used excessive force in taking him to the ground fails for similar reasons. Cummings' assertion that he tripped due to the leg chains is immaterial when considering the evidence from the perspective of a reasonable officer. Cummings' weight dropped immediately after he told officers he was not going to walk and that the officers could carry him. Whether or not his weight dropped due to tripping, it was reasonable for Jorgensen to interpret that movement as resistance and to take Cummings to the ground where he could be restrained while waiting for another officer to retrieve a restraint chair to complete the transfer. *See Blazek v. City of Iowa City*, 761 F.3d 920, 923 (8th Cir. 2014) (noting the Eighth Circuit has rejected an excessive force claim where an officer "forcefully threw" plaintiff to the ground and pinned him down using his body weight even though plaintiff had been only passively resistant). The officers were not required to carry Cummings or hold him up as they waited for a restraint chair, particularly in light of the circumstances leading to his transfer. Cummings has not established a genuine issue of material fact as to whether there was a constitutional violation. Jorgensen is entitled to qualified immunity on this claim.

---

[14] To the extent Cummings' claim against Donaghu is also based on an allegation that Donaghu used excessive force in placing his knee on Cummings' leg while Cummings was in the restraint chair, *see* Doc. 110 at 2, ¶ 6 [sic] (d), I find that Donaghu is also entitled to qualified immunity on this claim. The video shows that Cummings resisted his leg being restrained in the chair by lifting his leg up, at which point Donaghu used his knee to put it back down so Cummings' ankle could be restrained to the chair. Given Cummings' resistance, it was not objectively unreasonable for Donaghu to move Cummings into a position in which he could be properly restrained in the restraint chair to complete the transfer.

24

### 5.     Claims Against Wersal

Cummings claims that Wersal ordered officers to transfer Cummings.[15]   It is undisputed that Wersal did not personally participate in Cummings' transfer but observed from the hallway.  Therefore, I interpret this as a claim of supervisor liability.

A supervisor may be held individually liable under § 1983 if he or she directly participates in the constitutional violation or fails to train or supervise the subordinate who caused the violation.  *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994).  The standard of liability for failure to supervise is "demonstrated deliberate indifference or tacit authorization of the offensive acts." *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322 (8th Cir. 1986); *see also Brockinton v. City of Aherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007).

As noted above, Cummings refused multiple orders from Wersal to lockdown. Wersal then requested assistance from multiple officers to transfer Cummings to a temporary holding cell.  When officers entered the room, Cummings refused to follow commands to get on the ground.  He was shot with a pepper ball or two and still did not move to the ground as instructed.  Officers then physically had to pick him up and move him to the ground at which point they placed wrist and ankle restraints on him. Cummings does not make any excessive force claims against the officers involved in using the pepper ball gun, moving him to the ground or applying the restraints.  While he alleges excessive force claims related to what happened later during the transfer, his claim against Wersal is related to ordering officers to go "get" him.  *See* Doc. 98-3 at 48 ("Q: So your claim against Wersal is that she ordered this incident to happen.  Am I understanding you?  A: Yeah.").

---

[15] To the extent Cummings also asserts claims against Wersal based on her refusal to allow him to speak with a sergeant, *see* Doc. 6, these claims fail as a matter of law.  *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) (noting there is no liability under 42 U.S.C. § 1983 based only on a prison official's violation of a prison policy).

25

Cummings has failed to demonstrate a genuine issue of material fact as to whether Wersal tacitly authorized any offensive acts constituting excessive force. Cummings has not alleged excessive force was used against him when officers entered the room, took him to the ground and restrained him. Use of such force was not objectively unreasonable under the circumstances. *See Blazek*, 761 F.3d at 923. Wersal was not involved in these acts and Cummings has not submitted any evidence demonstrating she directed the officers in any particular way. Because Cummings has not demonstrated a genuine issue of material fact as to whether there was a constitutional violation, Wersal is entitled to qualified immunity.

## VI.   CONCLUSION

For the reasons stated herein, defendants' motion (Doc. 98) for summary judgment is **granted** as to all claims. Because this order disposes of all claims, judgment shall enter against plaintiff and in favor of defendants and the Clerk of Court shall close this case.

**IT IS SO ORDERED.**

**DATED** this 29th day of March, 2021.

_____
Leonard T. Strand, Chief Judge